1  JOSEPH P. RUSSONIELLO (CSBN 44332)
   United States Attorney
2  JOANN M. SWANSON (CSBN 88143)
   Chief, Civil Division
3  MELANIE L. PROCTOR (CSBN 228971)
   Melanie.Proctor@usdoj.gov
4  Assistant United States Attorney

5     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
6     Telephone: (415) 436-6730
      FAX: (415) 436-7169
7
   Attorneys for Defendants
8
                  UNITED STATES DISTRICT COURT
9
                NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN JOSE DIVISION
11
   JORGE ADAN ARREOLA,              )   No. C 08-777 JF
12                                  )
                   Plaintiff,       )   NOTICE OF MOTION AND
13                                  )   MEMORANDUM OF POINTS AND
          v.                        )   AUTHORITIES IN SUPPORT OF
14                                  )   DEFENDANTS' MOTION FOR
   MICHAEL B. MUKASEY, United States)   SUMMARY JUDGMENT
15 Attorney General; et al.,        )
                                    )   Date:  July 18, 2008
16                 Defendants.      )   Time:  9:00 a.m.
   _____)   Ctrm:  3
17
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

DEFENDANTS' MOTION
C 08-777 JF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    NOTICE OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV.   LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    LEGAL STANDARD APPLICABLE TO THIS MOTION . . . . . . . . . . . . . . . . 2

      B.    JURISDICTION AND RELIEF UNDER THE MANDAMUS ACT,
            THE ADMINISTRATIVE PROCEDURE ACT, AND THE
            DECLARATORY JUDGMENT ACT . . . . . . . . . . 2

      C.    NATURALIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            1.    Adjudication of Naturalization Applications . . . . . . . . . . . . . . . . . . . . . . 3

            2.    Name Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.    ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    DEFENDANTS MUKASEY AND MUELLER SHOULD BE
            DISMISSED . . . . . . . . . . . . 6

      B.    THE COURT LACKS SUBJECT MATTER JURISDICTION . . . . . . . . . . . . . . 7

            1.    8 U.S.C. § 1447(b) Is Inapplicable Where Plaintiff Has Not
                  Been Examined . . . . . . . . . . 7

            2.    The Court Lacks Jurisdiction Under the Mandamus Act
                  Because Plaintiff Cannot Establish The Existence of a
                  Nondiscretionary, Ministerial Duty . . . . . . . . . . . . 7

            3.    The Court Lacks Jurisdiction Under the APA Because Plaintiff
                  Cannot Show Action Has Been Unlawfully Withheld or
                  Unreasonably Delayed . . . . . . . . 8

**TABLE OF CONTENTS (continued)**

    4.    The Court Lacks Jurisdiction Under the Declaratory Judgment Act Because Plaintiff Has Failed To Establish An Independent Basis For Jurisdiction . . . . . . . . 9

C.    ASSUMING ARGUENDO, AGENCY ACTION HAS NOT BEEN UNREASONABLY DELAYED . . . . . . . . 10

    1.    A Rule of Reason Governs the Agency Decisions at Issue . . . . . . . . . . . 10

    2.    There Is No Congressionally Mandated Timetable . . . . . . . . . . . . . . . . 10

    3.    The Impact of the Delay is Minimal in Comparison with the National Interest in Complete and Thorough Background Checks . . . . . 12

    4.    The Effect of Expedition Would Intrude on Agency Discretion and Prejudice Other "First In Line" Applicants . . . 13

    5.    The Agencies are Exercising Every Effort to Address the Delay . . . . . . 15

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Alibeik v. Chertoff,
    No. C 07-1938 EDL, 2007 WL 4105527 (N.D. Cal. Nov. 16, 2007) . . . . . . . . . . . . . . . 6

Alkenani v. Barrows,
    356 F. Supp. 2d 652 (N.D. Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Allied Chemical Corp. v. Daiflon, Inc.,
    449 U.S. 33 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Alzuraiki v. Heinauer,
    No. 07CV 3189, 2008 WL 413861 (D. Neb. Feb. 13, 2008) . . . . . . . . . . . . . . . . . . . . 3, 9

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Badier v. Gonzales,
    475 F. Supp. 2d 1294 (N.D. Ga. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Boim v. Quranic Literacy Institute,
    291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Califano v. Sanders,
    430 U.S. 99 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Celotex Corp. v. Cattrett,
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cheney v. United States District Court for the District of Columbia,
    542 U.S. 367 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Clayton v. Chertoff, et al.,
    No. 07-cv-02781-CW, 2007 WL 2904049 (N.D. Cal. Oct. 1, 2007) . . . . . . . . . . . . . . . 6

Cordoba v. McElroy,
    78 F. Supp. 2d 240 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Dairi v. Chertoff,
    07-cv1014 JM (JMA), 2007 WL 3232503 (S.D. Cal. Nov. 1, 2007) . . . . . . . . . . . . . . 8

## TABLE OF AUTHORITIES (continued)

**FEDERAL CASES (continued)**

Dmitriev v. Chertoff,
    No. C 06-7677 JW, 2007 WL 1319533 (N.D. Cal. May 4, 2007) . . . . . . . . . . . . . . . . . . 6

Doe v. FBI,
    936 F.2d 1346 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Eldeeb v. Chertoff, et al.,
    No. 07-cv-236-T, 2007 WL 2209231 (M.D. Fla. July 30, 2007)  . . . . . . . . 5, 7, 10, 11, 15

Espin v. Gantner,
    381 F. Supp. 2d 261  (S.D.N.Y. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fraga v. Smith,
    607 F.  Supp. 517 (D. Or. 1985)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Freeman v. Arpaio,
    125 F.3d 732 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Heckler v. Ringer,
    466 U.S. 602 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

In re Barr Lab. Inc.,
    930 F.2d 72 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

INS v. Miranda,
    459 U.S. 14 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Kildare v. Saenz,
    325 F.3d 1078 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8

Konchitsky v. Chertoff,
    No. C-07-00294 RMW, 2007 WL 2070325 (N.D. Cal. July 13, 2007)  . . . . . . . . . . . . . 6

Li v. Chertoff,
    482 F. Supp. 2d 1172 (S.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Liberty Fund, Inc. v. Chao,
    394 F. Supp. 2d 105 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13, 15

**TABLE OF AUTHORITIES (continued)**

**FEDERAL CASES (continued)**

Marincas v. Lewis,
      92 F.3d 195 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Mighri v. Gonzales,
      No. 07-03624, 2007 WL 4463590 (E.D. Penn. Dec. 19, 2007) . . . . . . . . . . . . . . . . . . . . . 8

Moretazpour v. Chertoff,
      No. 07-4264 BZ, 2007 WL 4287363 (N.D. Cal. Dec. 5, 2007) . . . . . . . . . . . . . . . . . . . . . 6

Ngongo v. Ashcroft,
      397 F.3d 821 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Norton v. So. Utah Wilderness Alliance,
      542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Nova Stylings, Inc. v. Ladd,
      695 F.2d 1179 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pacific Marine Conservation Council, Inc. v. Evans,
      200 F. Supp. 2d 1194 (N.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Patil v. Mueller, et al.,
      No. C 07cv71 JCC, 2007 WL 1302752  (E.D. Va. Apr. 30, 2007) . . . . . . . . . . . . . . . . . 12

Safadi v. Howard,
      466 F. Supp. 2d 696 (E.D. Va. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Saleh v. Ridge,
      367 F. Supp. 2d 508  (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Schilling v. Rogers,
      363 U.S. 666 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Seattle Audubon Soc. v. Moseley,
      80 F.3d 1401 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sinha v. Upchurch,
      No. 07-CV 2274, 2007 WL 4322225 (N.D. Ohio Dec. 7, 2007) . . . . . . . . . . . . . . . . . . . . 8

**TABLE OF AUTHORITIES (continued)**

**FEDERAL CASES (continued)**

Skelly Oil Co. v. Phillips Petroleum Co.,
    339 U.S. 667 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Song v. Chertoff,
    No. 07-CV-855 W, 2008 WL 3256201 (S.D. Cal. Nov. 1, 2007)  . . . . . . . . . . . . . . . . . 7

Spencer Enterprises, Inc. v. United States,
    345 F.3d 683 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Staacke v. U.S. Department of Labor,
    841 F.2d 278 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Stang v. IRS,
    788 F.2d 564 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Sze v. INS,
    No. C 97-0569 SC, 1997 WL 446236 (N.D. Cal. Jul. 24, 1997) . . . . . . . . . . . . . . . . . . 13

Tang v. Chertoff,
    No. C 07-0395 JF, 2007 WL 1650938 (N.D. Cal. June 5, 2007)  . . . . . . . . . . . . . . . . . . 6

Telecomm. Research and Action Ctr. v. FCC,
    750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Walters v. Reno,
    145 F.3d 1032 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Wright v. Califano,
    587 F.2d 345 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Yan v. Mueller,
    No. H-07-0313, 2007 WL 1521732 (S.D. Tex. May 24, 2007)  . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
Appropriations Act of 1991,
    Pub. L. 101-515 104 Stat. 2102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
Appropriations Act of 1998,
    Pub. L. 105-119 111 Stat. 2440 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 9, 11

Intelligence Reform and Terrorism Prevention Act of 2004,
    Pub. L. No. 108-458, 118 Stat. 3638 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 U.S.C. § 552a(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 8

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 14

6 U.S.C. § 271(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6 U.S.C. §§ 271(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6 U.S.C. § 551(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6 U.S.C. § 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8 U.S.C. § 1105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8 U.S.C. § 1421(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. § 1446(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. § 1447(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 9

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 8

28 U.S.C. § 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 9

**FEDERAL RULES**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

**FEDERAL REGULATIONS**

8 C.F.R. § 335.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8 C.F.R. § 335.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 C.F.R. § 20.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 20.33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Privacy Act of 1974, Notice of Modified Systems of Records,
       63 Fed. Reg. 8 (Feb. 20, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**LOCAL RULES**

Civ. L. R. 7-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**OTHER AUTHORITIES**

The 9/11 Commission Report, 2004 WL 1634382 at 352 (July 22, 2004) . . . . . . . . . . . . . . . . 12

## I.    NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on July 18, 2008, at 9:00 a.m., before the Honorable Jeremy Fogel, Courtroom 3, 280 South First Street, San Jose, California, 95113, Defendants Michael B. Mukasey, United States Attorney General, et al., by their attorneys, Joseph P. Russoniello, United States Attorney for the Northern District of California, and Melanie L. Proctor, Assistant United States Attorney, will move this Court for an order granting summary judgment to Defendants on Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 56(c).

Defendants' Motion is based on this notice, the points and authorities in support of this motion, the attached declaration of Janaki Rangaswamy, and on such oral argument as the Court may permit.  In accordance with Civ. L. R. 7-3, Plaintiff's opposition is due 21 days prior to the hearing.

## II.    INTRODUCTION

Plaintiff Jorge Adan Arreola ("Plaintiff") asks the Court to compel Defendants to complete his name check and adjudicate his naturalization application.  However, he has not yet been interviewed on his application.  The U.S. Citizenship and Immigration Services ("USCIS") is mandated by statute to await the results of all background checks before scheduling an interview. Furthermore, the Federal Bureau of Investigation's ("FBI") Name Check Program is discretionary, and by contract to the requesting agencies.  Accordingly, Plaintiff cannot establish the existence of a nondiscretionary, ministerial duty that is owed to him.  Defendants respectfully ask this Court to grant their motion for summary judgment.

## III.    FACTUAL BACKGROUND

Plaintiff is a lawful permanent resident of the United States.  Declaration of Janaki Rangaswamy ("Rangaswamy Decl."), p. 9 ¶ 19.  On September 5, 2006, he filed an application for naturalization to United States citizenship.  Id.    His name check was submitted to the FBI on September 18, 2006. Id.  To date, because his name check remains pending, Plaintiff has not been interviewed on his application.  Id.  On February 1, 2008, Plaintiff commenced this action asserting jurisdiction under  5 U.S.C. § 701 et seq., 8 U.S.C. § 1447(b), and 28 U.S.C. §§ 1331, 1361, and 2201. Plaintiff asks this Court to assume jurisdiction over the matter, to require Defendants to

1  expeditiously complete his name check and process his naturalization application, and to award him

2  attorney's fees.  Complaint, p. 3, Prayer for Relief.

3  **IV.    LEGAL BACKGROUND**

4  A.    <u>LEGAL STANDARD APPLICABLE TO THIS MOTION</u>

5  Summary judgment is appropriate when the "pleadings, depositions, answers to

6  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

7  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

8  of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is sufficient evidence for a

9  reasonable fact finder to find for the non-moving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477

10  U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome of the case.  <u>See</u>

11  <u>id.</u> at 248.  The Ninth Circuit has declared that "[i]n considering a motion for summary judgment,

12  the court may not weigh the evidence or make credibility determinations, and is required to draw

13  all inferences in a light most favorable to the non-moving party." <u>Freeman v. Arpaio</u>, 125 F.3d 732,

14  735 (9th Cir. 1997).  A principal purpose of the summary judgment procedure is to identify and

15  dispose of factually unsupported claims. <u>See</u> <u>Celotex Corp. v. Cattrett</u>, 477 U.S. 317, 323-24 (1986).

16  B.    JURISDICTION AND RELIEF UNDER THE MANDAMUS ACT, THE
      ADMINISTRATIVE PROCEDURE ACT, AND THE DECLARATORY
17    JUDGMENT ACT

18  Under the Mandamus Act, a court may compel performance of "a duty owed to the plaintiff."

19  28 U.S.C. § 1361.  Further, "[m]andamus writs, as extraordinary remedies, are appropriate only

20  when a federal officer, employee, or agency owes a nondiscretionary duty to the plaintiff that is 'so

21  plainly prescribed as to be free from doubt.'" <u>Stang v. IRS</u>, 788 F.2d 564 (9th Cir. 1986), quoting

22  <u>Nova Stylings, Inc. v. Ladd</u>, 695 F.2d 1179, 1180 (9th Cir. 1983).  The United States Supreme Court

23  has stated that "[t]he common law writ of mandamus is intended to provide a remedy for a plaintiff

24  only if . . . the defendant owes him a clear nondiscretionary duty." <u>Heckler v. Ringer</u>, 466 U.S. 602,

25  616 (1984). The Ninth Circuit has explained that

26      [m]andamus . . . is available to compel a federal official to perform a duty only if: (1)
        the individual's claim is clear and certain; (2) the official's duty is nondiscretionary,
27      ministerial, and so plainly prescribed as to be free from doubt, and (3) no other
        adequate remedy is available.

28

1    Kildare v. Saenz, 325 F.3d 1078, 1084 (9th Cir. 2003). Mandamus is an extraordinary remedy.

2    See Cheney v. United States District Court for the District of Columbia, 542 U.S. 367, 392

3    (2004) (Stevens, J., concurring); Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).

4        The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., does not provide an

5    independent jurisdictional basis. Califano v. Sanders, 430 U.S. 99, 107 (1977); Staacke v. U.S.

6    Department of Labor, 841 F.2d 278, 282 (9th Cir. 1988). Rather, it merely provides the standards

7    for reviewing agency action once jurisdiction is otherwise established. Staacke, 841 F.2d at 282.

8    The Court has jurisdiction over Plaintiff's APA claim "only if §§ 702 and 706(1) of the APA, in

9    conjunction with the federal question statute, 28 U.S.C. § 1331, provide jurisdiction." Alzuraiki v.

10   Heinauer, No. 07CV 3189, 2008 WL 413861, at *2 (D. Neb. Feb. 13, 2008). Under the APA, a

11   court may compel an administrative agency to perform an action that has been "unlawfully

12   withheld" or "unreasonably delayed" by that agency. 5 U.S.C. § 706(1). A court cannot compel an

13   agency to take an action it is not lawfully required to take. Norton v. So. Utah Wilderness Alliance,

14   542 U.S. 55, 63 (2004). Finally, the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, does not

15   provide an independent basis for jurisdiction; rather, it only expands the range of remedies available

16   in federal courts. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950).

17       C.    NATURALIZATION

18           1.    Adjudication of Naturalization Applications

19       The Secretary of the Department of Homeland Security ("DHS") has "sole authority to

20   naturalize persons as citizens of the United States."[1]   8 U.S.C. § 1421(a). The relevant statutes also

21   provide that "[b]efore a person may be naturalized, and employee of the Service, or of the United

22   States designated by the [Secretary] shall conduct a personal investigation of the person applying

23   for naturalization . . . . "   8 U.S.C. § 1446(a); see also 8 C.F.R. § 335.1 ("Subsequent to the filing

24   of an application for naturalization, the Service shall conduct an investigation of the applicant. The

25

26   _____

27       [1]On March 1, 2003, the Department of Homeland Security and its United States Citizenship
     and Immigration Services assumed responsibility for adjudication of naturalization applications.
28   6 U.S.C. § 271(b). Accordingly, the discretion formerly vested in the Attorney General is now
     vested in the Secretary of Homeland Security.  6 U.S.C. § 551(d).

1    investigation shall consist, at a minimum, of a review of all pertinent records.").

2        Before a decision is rendered on an alien's application to naturalize, USCIS conducts several

3    forms of security and background checks to ensure that the alien is eligible for the benefit sought

4    and that she is not a risk to national security or public safety. See 8 C.F.R. § 335.2(b); Rangaswamy

5    Decl., pp. 2-3 ¶ 5. USCIS also conducts investigations into the bona fides of petitions and

6    applications that have been filed, in order to maintain the integrity of the application process and to

7    ensure that there is no fraud in the application process. See 8 U.S.C. § 1105(a) (authorizing "direct

8    and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central

9    Intelligence Agency and with other internal security officers of the Government for the purpose of

10   obtaining and exchanging information for use in enforcing the provisions of this chapter in the

11   interest of the internal and border security of the United States").

12       These checks currently include: (1) an FBI name check, which is run against FBI

13   investigative databases compiled by law enforcement agencies including administrative, applicant,

14   criminal, personnel and other files; (2) an FBI fingerprint check, which provides information relating

15   to criminal background within the United States; and (3) a check against the Interagency Border

16   Inspection System ("IBIS"), which contains records and information from more than 20 federal law

17   enforcement and intelligence agencies, and is used to compile information regarding national

18   security risks, public safety concerns, and other law enforcement concerns. See Rangaswamy Decl.,

19   pp. 2-3 ¶ 5. Congress has mandated that the agency withhold adjudication until the necessary

20   background checks are complete:

> [D]uring fiscal year 1998 and each fiscal year thereafter, none of the funds
> appropriated or otherwise made available to the Immigration and Naturalization
> Service shall be used to complete adjudication of an application for naturalization
> unless the Immigration and Naturalization Service has received confirmation from
> the Federal Bureau of Investigation that a full criminal background check has been
> completed . . . .

25   Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations

26   Act of 1998 ("1998 Appropriations Act"), Pub. L. 105-119, 111 Stat. 2440, 2448-49. USCIS has

27   implemented this prohibition in its regulations. See 8 C.F.R. § 335.2(b) (providing that an initial

28   examination cannot be scheduled until USCIS receives a definitive response that full criminal

1   background check has been completed).

2           2.    Name Checks

3           The FBI's name check process is quite complex.  See Eldeeb v. Chertoff, et al., No. 07-cv-

4   236-T, 2007 WL 2209231, at *4 (M.D. Fla. July 30, 2007).  The name checks performed by the FBI

5   at the request of USCIS consist of reviews of FBI investigative records from the FBI's Central

6   Records System.  The FBI's Central Records System includes  the investigative records relating to

7   the hundreds of federal violations over which the FBI has investigative jurisdiction, and it includes

8   information on subjects, suspects, victims, witnesses and close relatives and associates who are

9   relevant to an investigation.  See Doe v. FBI, 936 F.2d 1346, 1348 n.2 (D.C. Cir. 1991) (explaining

10  that the Central Records System is the FBI's central filing system, containing the agency's

11  investigative records on various individuals and subject matters).

12          Criminal history record information, such as records of arrests and convictions, is separate

13  and distinct from the raw investigative reports and other types of investigative information contained

14  in the FBI's Central Records System.  Criminal history record information is contained in systems

15  such as the Fingerprint Identification Records System ("FIRS") and the Interstate Identification

16  Index System ("III System"), which is accessible through the National Crime Information Center

17  ("NCIC").  See 28 C.F.R. § 20.3(l)-(n) (defining the FIRS, the III System, and the NCIC,

18  respectively, for purposes of the regulations regarding exchange of criminal history record

19  information); 28 C.F.R. § 20.33 (discussing the dissemination of criminal history record

20  information).

21          The FBI's discretionary authority to release information from its Central Records System

22  is set forth in the routine uses published as part of the Privacy Act Notice for the Central Records

23  System.  See 5 U.S.C. § 552a(b)(3) (allowing dissemination of records pursuant to a published

24  routine use).  One of the routine uses published in the Privacy Act Notice for the Central Records

25  System is that

26          information from this system may be disclosed as a routine use to any Federal
            agency where the purpose in making the disclosure is compatible with the law
27          enforcement purpose for which it was collected, e.g., . . . to assist the recipient
            agency in the performance of any authorized function where access to records in this
28          system is declared by the recipient agency to be relevant to that function.

Privacy Act of 1974, Notice of Modified Systems of Records, 63 Fed. Reg. 8,659, 8,682 (Feb. 20, 1998) (emphasis added). Furthermore, in 1990, Congress provided that if the FBI so desired, it could establish and collect fees to process name checks:

> for fiscal year 1991 and hereafter the Director of the Federal Bureau of Investigation <u>may</u> establish and collect fees to process fingerprint identification records and name checks for non-criminal justice, non-law enforcement employment and licensing purposes and for certain employees of private sector contractors with classified Government contracts, and notwithstanding the provisions of 31 U.S.C. 3302, credit such fees to this appropriation to be used for salaries and other expenses incurred in providing these services, and that the Director of the Federal Bureau of Investigation <u>may</u> establish such fees at a level to include an additional amount to establish a fund to remain available until expended to defray expenses for the automation of fingerprint identification services and associated costs . . . .

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1991 ("1991 Appropriations Act"), Pub. L. 101-515, 104 Stat. 2102, 2112 (emphasis added).

## V.   ANALYSIS

### A.   <u>DEFENDANTS MUKASEY AND MUELLER SHOULD BE DISMISSED</u>

This Court has recognized that since March 1, 2003, the Department of Homeland Security has been the agency responsible for implementing the immigration laws of the United States.[2] <u>Tang v. Chertoff</u>, No. C 07-0395 JF, 2007 WL 1650938, at *3 (N.D. Cal. June 5, 2007); <u>see</u> 6 U.S.C. §§ 271(b)(5), 557; <u>Alibeik v. Chertoff</u>, No. C 07-1938 EDL, 2007 WL 4105527, at *3 (N.D. Cal. Nov. 16, 2007); <u>Clayton v. Chertoff, et al.</u>, No. 07-cv-02781-CW, 2007 WL 2904049, at *3 (N.D. Cal. Oct. 1, 2007); <u>Konchitsky v. Chertoff</u>, No. C-07-00294 RMW, 2007 WL 2070325, at *6-7 (N.D. Cal. July 13, 2007); <u>Dmitriev v. Chertoff</u>, No. C 06-7677 JW, 2007 WL 1319533, at *4 (N.D. Cal.

---

[2]Defendants acknowledge a decision in this District to the contrary, but respectfully submit that this minority decision is in error because that decision did not consider the discretionary nature of the name check process. <u>See</u> <u>Moretazpour v. Chertoff</u>, No. 07-4264 BZ, 2007 WL 4287363 (N.D. Cal. Dec. 5, 2007). Moreover, in that decision, the court suggested that the Department of Homeland Security had, by regulation, imposed a duty upon the FBI to process name checks. <u>Id.</u>, at *1. It is doubtful that one agency can create such a duty for another, particularly in light of the discretionary nature of the name check program itself. <u>See</u> 1991 Appropriations Act, Pub. L. 101-515, 104 Stat. 2102, 2112 (stating that the FBI "may" establish a name check program); <u>Pacific Marine Conservation Council, Inc. v. Evans</u>, 200 F. Supp. 2d 1194, 1201 (N.D. Cal. 2002) (describing "may" as discretionary language). Moreover, although the district court also considered Congress' directive in the 1998 Appropriations Act discussed above, it is equally doubtful that Congress intended, in restricting action by one agency, to impose a duty upon another.

1   May 4, 2007).    Accordingly, Defendants Mukasey and Mueller have no role in adjudicating

2   Plaintiff's application for naturalization, and the matter should be dismissed as it pertains to them.

3        Moreover, the FBI's name check program is discretionary, not only in its existence, but in

4   the manner in which the name checks are conducted. 1991 Appropriations Act, Pub. L. 101-515,

5   104 Stat. 2102, 2112 ; see Yan v. Mueller, No. H-07-0313, 2007 WL 1521732, at *6 (S.D. Tex.

6   May 24, 2007) ("The evidence shows that the delay is due, not only to the volume of requests that

7   the FBI receives, but also to the FBI's exercise of discretion in determining the timing for

8   conducting the many name check requests that it receives and the manner in which to conduct those

9   checks."(emphasis added)).    Finally, if any duty is owed, it is owed to USCIS, not Plaintiff. See

10  Eldeeb, 2007 WL 2209231, at *21 (dismissing the FBI, stating that the duty owed by the FBI is to

11  USCIS, not the plaintiff).    Accordingly, Defendants Mukasey and Mueller should be dismissed from

12  this action.

13        B.    THE COURT LACKS SUBJECT MATTER JURISDICTION

14             1.    8 U.S.C. § 1447(b) Is Inapplicable Where Plaintiff Has Not Been Examined

15        Plaintiff asserts that the Court has jurisdiction under 8 U.S.C. § 1447(b).    Complaint, ¶¶ 4,

16  57, 58.    On its face, that section applies only where the applicant has been examined on his

17  application:

18            If there is a failure to make a determination under section 1446 of this title before the
            end of the 120-day period after the date on which the examination is conducted under
19            such section, the applicant may apply tot he United States district court for the
            district in which the applicant resides for a hearing on the matter.
20

21  8 U.S.C. § 1447(b).    Here, Plaintiff admits that he has not yet been examined on his application.

22  Complaint, ¶ 13.    Accordingly, this section does not vest the Court with jurisdiction.    See Song v.

23  Chertoff, No. 07-CV-855 W, 2008 WL 3256201, at *2 (S.D. Cal. Nov. 1, 2007) ("Because the 120-

24  day period under section 1447(b) does not commence until after Song has been interviewed, the

25  Court lacks jurisdiction over his application.").

26  ///

27  ///

28  ///

DEFENDANTS' MOTION
C 08-777 JF                              7

1

2.    The Court Lacks Jurisdiction Under the Mandamus Act Because Plaintiff
Cannot Establish The Existence of a Nondiscretionary, Ministerial Duty

2

3        Mandamus relief is available only where the plaintiff can establish the existence of a

4    nondiscretionary, ministerial duty. <u>Kildare</u>, 325 F.3d at 1084. Here, Congress has expressly

5    forbidden action on Plaintiff's naturalization application until USCIS receives the full results of his

6    background check. 1998 Appropriations Act, Pub. L. 105-119, 111 Stat. 2440, 2448-49. Because

7    Plaintiff cannot establish the existence of a nondiscretionary, ministerial duty either to examine

8    Plaintiff in the absence of a completed background check, the Mandamus Act does not vest the

9    Court with subject-matter jurisdiction. <u>Kildare</u>, 325 F.3d at 1084; <u>see also</u> <u>Mighri v. Gonzales</u>, No.

10    07-03624, 2007 WL 4463590, at *5 (E.D. Penn. Dec. 19, 2007) (finding the court lacked subject

11    matter jurisdiction over the plaintiff's claim that USCIS should schedule his naturalization

12    interview); <u>Sinha v. Upchurch</u>, No. 07-CV 2274, 2007 WL 4322225, at *3-4 (N.D. Ohio Dec. 7,

13    2007) (finding that the duty to act on a naturalization application within a reasonable time does not

14    commence until after USCIS receives a completed background check); <u>Dairi v. Chertoff</u>, 07-cv1014

15    JM (JMA), 2007 WL 3232503, at *2 (S.D. Cal. Nov. 1, 2007) (dismissing for lack of subject matter

16    jurisdiction a mandamus action brought to compel adjudication of naturalization application); <u>Badier</u>

17    <u>v. Gonzales</u>, 475 F. Supp. 2d 1294, 1299 (N.D. Ga. 2006) (dismissing mandamus action for lack of

18    subject matter jurisdiction where the plaintiff had not yet been interviewed).

19

3.    The Court Lacks Jurisdiction Under the APA Because Plaintiff Cannot Show
Action Has Been Unlawfully Withheld or Unreasonably Delayed

20

21        Plaintiff also asserts that the Court has subject matter jurisdiction pursuant to 28 U.S.C.

22    § 1331 (Federal Question), and 5 U.S.C. § 701 <u>et seq.</u> (APA). The Ninth Circuit has noted that

23    "agency actions are generally reviewable under federal question jurisdiction, pursuant to 28 U.S.C.

24    § 1331." <u>Spencer Enterprises, Inc. v. United States</u>, 345 F.3d 683, 687 (9th Cir. 2003). The APA

25    provides the standards of review for agency action. <u>Id.</u> at 688. What the APA provides, however,

26    is not unfettered review.

27        The APA allows review only of action "unlawfully withheld or unreasonably delayed."

28    5 U.S.C. § 706(1). Here, because Congress has specifically forbidden action on Plaintiff's

1    application, he cannot establish that USCIS has either unlawfully withheld or unreasonably delayed

2    action. 1998 Appropriations Act, Pub. L. 105-119, 111 Stat. 2440, 2448-49; Rangaswamy Decl.,

3    pp. 4-5 ¶ 14. Moreover, "when Congress intended time limitations on adjudication of naturalization

4    petitions, it expressly created them." Alzuraiki, 2008 WL 413861, at *3; see 8 U.S.C. § 1447(b)

5    (allowing applicant who has not received a decision within 120 days of an examination to seek a

6    hearing on his or her application in the district court).

7        USCIS has acted in accordance with the congressional directive set forth in the 1998

8    Appropriations Act. Rangaswamy Decl., p. 9 ¶ 20. Accordingly, the APA, in conjunction with the

9    Federal Question Statute, does not vest the Court with jurisdiction to review his claims. See

10    Alzuraiki, 2008 WL 413861, at *4 ("Because plaintiff fails to allege a legally required duty on the

11    part of the CIS Defendants . . . this Court lacks both APA and mandamus jurisdiction over plaintiff's

12    claims.").

13            4.      The Court Lacks Jurisdiction Under the Declaratory Judgment Act Because
                      Plaintiff Has Failed To Establish An Independent Basis For Jurisdiction

14

15        Finally, Plaintiff asserts that jurisdiction exists under the Declaratory Judgment Act, 28

16    U.S.C. § 2201. It has long been held that "the availability of such relief presupposes the existence

17    of a judicially remediable right." Schilling v. Rogers, 363 U.S. 666, 677 (1960). The Ninth Circuit

18    has explained that "where jurisdiction exists, the Act is intended to allow earlier access to federal

19    courts in order to spare potential defendants from the threat of impending litigation." Seattle

20    Audubon Soc. v. Moseley, 80 F.3d 1401, 1405 (9th Cir. 1996). Here, because Plaintiff has not

21    established jurisdiction under either the Mandamus Act or the APA, the DJA does not confer

22    jurisdiction. Li v. Chertoff, 482 F. Supp. 2d 1172, 1179 (S.D. Cal. 2007).[3]

23    ///

24    ///

25    ///

26

27

28            [3]Plaintiff also seeks attorney's fees. Complaint, ¶¶ 59-62. This request is premature, and
        only relevant should Plaintiff prevail on his claims. Accordingly, Defendants reserve their
        arguments on this claim for a later date.

DEFENDANTS' MOTION

1

2

C.    ASSUMING ARGUENDO, AGENCY ACTION HAS NOT BEEN
UNREASONABLY DELAYED

3

4

5

6

7

Assuming arguendo, and the Court determines that it has subject matter jurisdiction, Plaintiff has failed to establish the existence of an unreasonable delay.  To determine whether a delay is egregious, such that relief under the APA is warranted, several circuits have adopted the six-part test first articulated in Telecomm. Research and Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC").

8

1.    A Rule of Reason Governs the Agency Decisions at Issue

9

10

11

12

13

14

15

16

17

18

The first TRAC factor requires an agency to govern decisions with a rule of reason.  TRAC, 750 F.2d at 80.  Given the large volume of petitions and applications requiring adjudication, the extensive background check that is required for national security and public safety, and the limited resources available to it, the FBI is proceeding in an orderly fashion with the completion of name checks in the order in which they are received.  See Eldeeb, 2007 WL 2209231, at *2.  Once the FBI name check in this case has been completed, USCIS will promptly proceed on Plaintiff's application. Rangaswamy Decl., p. 9 ¶ 21.  Further, USCIS regularly monitors the case to determine whether the name check remains pending.  Id., p. 6 ¶ 12.  Public safety requires USCIS to make certain that the background checks have been completed and any outstanding issues resolved before it reaches a decision.  Id., pp. 2-3 ¶ 5.

19

20

21

22

23

24

25

In Plaintiff's case, this means that USCIS must await the results of the FBI name check before scheduling him for an examination, and the FBI must be given time to perform an accurate and thorough check.  Id., p. 9  ¶ 20.  The FBI's "first in, first out" processing approach is a method that is "deserving of deference."  Liberty Fund, Inc. v. Chao, 394 F. Supp. 2d 105, 118 (D.D.C. 2005); see also In re Barr Lab. Inc., 930 F.2d 72, 76 (D.C. Cir. 1991) ("The agency is in a unique and authoritative position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way.").

26

2.    There Is No Congressionally Mandated Timetable

27

28

The second TRAC factor does not apply to the present case because Congress has mandated that USCIS not adjudicate before receiving the results of the full background check. 1998

1   Appropriations Act, Pub. L. 105-119, 111 Stat. 2440, 2448-49. Moreover, Congress has clearly
2   demonstrated that where it desires time limits on the processing of name checks, it knows how to
3   set them. See Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458,
4   § 3001(g), 118 Stat. 3638 (2004) (requiring Government personnel security checks to be completed
5   within a certain time frame).

6        Where there are no statutory guidelines, and in order to establish a "rule of reason," this
7   Court must consider the factors that contribute to the backlogs that both the FBI and USCIS face.
8   See, e.g., INS v. Miranda, 459 U.S. 14, 18 (1982) ("Both the number of the applications received
9   by the INS and the need to investigate their validity may make it difficult for the agency to process
10  an application as promptly as may be desirable"). In making a request for immigration benefits,
11  "aliens only have those statutory rights granted by Congress," Marincas v. Lewis, 92 F.3d 195, 203
12  (3d Cir. 1996), and no federal statute or regulation prescribes a hard-and-fast deadline for acting
13  upon immigration applications, such as the ones in this case, submitted to the USCIS. See Cordoba
14  v. McElroy, 78 F. Supp. 2d 240, 244 (S.D.N.Y. 2000).

15       As discussed in Eldeeb, the FBI name check is a complex process. Eldeeb, 2007 WL
16  2209231, at *2. It involves a check of a variety of sources, and although most name checks are
17  resolved in a matter of hours, approximately 32 percent require additional, manual review. Id., at
18  *2. Of those remaining checks, 22 percent are returned within two months. Id. The FBI processes
19  name checks chronologically, based on the date the name check is submitted. Id.

20       Before September 11, 2001, the FBI processed approximately 2.5 million name checks per
21  year, checking only the "main" files. Id. at *3. In Fiscal Year 2006, the FBI processed over 3.4
22  million name checks. Id. In addition, the FBI began checking "reference" files. Id. This expansion
23  of the name check procedures prompted USCIS, in December 2002 and January 2003, to resubmit
24  2.7 million name check requests, for those with pending applications for immigration benefits. Id.
25  at *4. The FBI is currently still working to resolve 440,000 of these resubmitted name checks;
26  because the FBI processes name checks chronologically, the processing of regular name checks has
27  been delayed. Id. Name checks that exceed the two month window require personal attention of
28  the processing agent. Id. at *5. The FBI currently processes approximately 340,000 name checks

1    per year by hand.  Id.  Thus, it is evident that there are substantial factors contributing to the

2    backlog.

3                    3.    The Impact of the Delay is Minimal in Comparison with the National
                          Interest in Complete and Thorough Background Checks

4

5        The third TRAC factor is the delay's impact on human health, welfare, and economic harm

6    to Plaintiff.  This factor's analysis overlaps with the analysis of the fifth TRAC factor, the nature

7    and extent of the interests prejudiced by the delay.  TRAC, 750 F.2d at 80; Liberty Fund, 394 F.

8    Supp. 2d at 118.  Plaintiffs may be inconvenienced by the delay in adjudication, but this individual

9    interest cannot outweigh Defendants' interests in fully and accurately completing each name check.

10   Security background checks for individuals seeking immigration benefits is a key component to our

11   nation's national security.  See The 9/11 Commission Report, 2004 WL 1634382 at 352

12   (July 22, 2004) (finding that, "had the immigration system set a higher bar for determining whether

13   individuals are who or what they claim to be....it could have potentially have excluded, removed,

14   or come into further contact with several hijackers who did not appear to meet the terms for

15   admitting short-term visitors.").

16       In most cases, the adverse impact caused by the delay is not substantial.  Applicants for

17   adjustment of status who have pending applications may apply for and obtain employment

18   authorization for the entire time the application is pending.  Here, Plaintiff argues that his wife is

19   in removal proceedings, and that once he naturalizes, she will be immediately eligible for an

20   immigrant visa.[4]  Complaint, ¶ 36.  However, approval of an I-130 visa petition is merely the first

21   step in the visa application process, and it does not entitle the alien to adjustment of status as an

22   immediate relative of a United States citizen.  Ngongo v. Ashcroft, 397 F.3d 821, 823 (9th Cir.

23   2005).  Plaintiff's claim is thus speculative, and assumes that his wife is otherwise eligible for

24   adjustment of status.

25       Even when a more substantial impact is felt by an applicant, this impact, "is unlikely to rise

26   to the level that would significantly change the Court's assessment of the unreasonableness of the

27   ─────────────────

28       [4]As a lawful permanent resident, Plaintiff enjoys the right to travel and work with little
     restriction.  Rangaswamy Decl., p. 8 ¶ 18.  His claim to the contrary lacks merit.  Complaint, ¶ 46.

DEFENDANTS' MOTION
C 08-777 JF                                    12

1    delay in light of the importance of the agency's competing priorities." Liberty Fund, 394 F. Supp.

2    2d at 118. As the highest of priorities, "our national security requires that caution and thoroughness

3    in these matters not be sacrificed for the sake of expediency." Safadi v. Howard, 466 F. Supp. 2d

4    696, 701 (E.D. Va. 2006). Although a delay in processing may have a negative impact,

5    "nevertheless, in this post-9/11 context, agencies must have the freedom to carefully and thoroughly

6    investigate these applications without judicial interference in their priorities." Patil v. Mueller, et

7    al., No. C 07cv71 JCC, 2007 WL 1302752 at *2 (E.D. Va. Apr. 30, 2007) (holding that the Court

8    had no jurisdiction to issue a writ of mandamus due to legal and policy considerations). Thus, when

9    balancing the agencies' interests in defending against threats to national security against the

10   Plaintiff's interest in adjudication, the interests of the nation must prevail.

11           4.      The Effect of Expedition Would Intrude on Agency Discretion and
                     Prejudice Other "First In Line" Applicants
12

13           The court in Sze v. INS, No. C 97-0569 SC, 1997 WL 446236, at *8 (N.D. Cal.

14   Jul. 24, 1997), which applied the TRAC test to a similar complained-of delay in the immigration

15   context, found the fourth factor to be the most persuasive. Id. at *8. The court, in refusing to grant

16   relief under the APA, held that "the reasonableness of administrative delays must be judged in light

17   of the resources available to the agency." Id. The court also recognized that by granting relief, it

18   "would, at best, reorder the queue of applications, thereby leading to little net benefit." Id.; see also

19   Liberty Fund, 394 F. Supp. 2d at 117 (deferring to agency's decision on how to handle competing

20   applications for permanent labor certifications).

21           In Liberty Fund, the court refused to grant mandamus relief where it was requested solely

22   due to the length of the delay in processing alien labor certifications. 394 F. Supp. 2d at 115.

23   Applying the TRAC factors, the court held that without a statutory timetable governing agency

24   action, the TRAC factor, "that weighs most heavily under the circumstances of the case is the fourth

25   factor - the effect of granting relief on the agency's competing priorities." Id. at 116. The court

26   reasoned that the agency's "first in, first out processing" was deserving of deference because any

27   grant of relief to petitioners would result in no net gain - petitioners would move to the front of the

28   queue at the expense of other similarly situated applicants. After examining the agency's priorities,

1    growing workload, and good faith efforts to alleviate the delays, the court concluded that mandamus

2    relief was not warranted.  Id. at 119.

3        Just as in Liberty Fund, Plaintiff's argument of unreasonable delay in this case must also fail.

4    Plaintiff asks this Court to find that USCIS has not adjudicated his naturalization application in a

5    reasonable period of time.  Plaintiff's legal arguments under 5 U.S.C. § 706(1) fail because

6    adjudication has not been unreasonably delayed.  Contrary to Plaintiff's pleadings, the existence of

7    administrative delays does not mean that such delays are unreasonable.  Courts have noted that "the

8    reasonableness of such delays must be judged in light of the resources that Congress has supplied

9    to the agency for the exercise of its functions, as well as the impact of the delays on the applicants'

10   interests."  Fraga v. Smith, 607 F. Supp. 517, 521 (D. Or. 1985) (citing Wright v. Califano, 587 F.2d

11   345, 353 (7th Cir. 1978)).  Indeed, "[t]he passage of time alone is rarely enough to justify a court's

12   intervention in the administrative process."  Fraga, 607 F. Supp. at 521.

13       Similarly, the effect of expediting delayed agency action under the fourth TRAC factor

14   would unquestionably impinge upon agency activities and responsibilities of a higher priority.  Such

15   an order would intrude on the agency's discretion and ability to fulfill its highest priority of

16   safeguarding the nation.  See Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1027 (7th Cir.

17   2002) ("the government's interest in preventing terrorism is not only important but paramount"); see

18   also Walters v. Reno, 145 F.3d 1032, 1043 (9th Cir. 1998) ("The Government's interests in the

19   administration of its immigration laws and in preventing [immigration related] document fraud are

20   likewise considerable.").

21       Delays in the processing of FBI name checks arise for a variety of reasons.  First, USCIS is

22   not the only agency that engages in the FBI name check program.   Notably, the FBI and USCIS

23   processes' do not occur in vacuums.  Any requirement that the FBI or USCIS process Plaintiff's

24   name check or application within a particular time limit will have the unfortunate side effect of

25   slowing the processing for other applicants who are also awaiting action on their applications for

26   immigration benefits.  Here, Plaintiff's application is under adjudication at the California Service

27   Center ("CSC").  See Rangaswamy Decl., p. 1, ¶ 2.  In Fiscal Year 2007, the CSC received 401,050

28   naturalization applications, and completed initial processing of 227,165 naturalization applications.

1 | <u>Id.</u>, pp. 1-2 ¶ 3.

2 |     Courts have been cautioned against "engrafting their own notions of proper procedures upon

3 | agencies entrusted with substantive functions by Congress." <u>Vermont Yankee Nuclear Power Corp.</u>

4 | <u>v. Natural Resources Defense Council, Inc.</u>, 435 U.S. 519, 525 (1978). Here, where "there are no

5 | allegations of bad faith, a dilatory attitude, or a lack of evenhandedness on the part of the agency,

6 | the reasonableness of the delays in terms of the legislatively imposed 'reasonable dispatch' duty

7 | must be judged in light of the resources that Congress has supplied, as well as the impact of the

8 | delays on the applicants' interests." <u>Wright</u>, 587 F.2d at 353. The complexity of agency

9 | investigations, as well as the extent that the individual applicants contributed to delays, also enter

10 | into a court's deliberations. <u>See</u> <u>Saleh v. Ridge</u>, 367 F. Supp. 2d 508, 512 (S.D.N.Y. 2005). Setting

11 | a time frame on adjudication of Plaintiff's application would interfere with USCIS's ability to fully

12 | investigate the name check response, if necessary. Rangaswamy Decl., p. 5 ¶ 9.

13 |               5.    <u>The Agencies are Exercising Every Effort to Address the Delay</u>

14 |     The sixth and last <u>TRAC</u> factor provides that a court need not find impropriety to hold that

15 | an agency action is unreasonably delayed. Conversely, "the good faith of the agency in addressing

16 | the delay weighs against mandamus." <u>Liberty Fund</u>, 394 F. Supp. 2d at 120. Here, the delay is due

17 | to the pendency of Plaintiff's FBI name check. <u>See</u> Rangaswamy Decl., p. 9 ¶ 20. As discussed

18 | above, the FBI is processing the name checks to the best of its ability, and USCIS is monitoring the

19 | case to ensure that once the name check is complete, USCIS can complete adjudication. Thus,

20 | balancing the <u>TRAC</u> factors demonstrates the reasonableness of the Government's actions.

21 |     In addition, Plaintiff has failed to show that USCIS will refuse to adjudicate his application

22 | once the FBI completes the requisite name check. <u>See</u> <u>Saleh</u>, 367 F. Supp. 2d at 513; <u>see also</u>

23 | <u>Eldeeb</u>, 2007 WL 209231, at *17 (finding that the plaintiff had failed to show that USCIS was

24 | refusing to act on his application). On the contrary, the FBI and USCIS are taking active steps

25 | towards completing the background checks for adjudication of his application. Specifically, USCIS

26 | is making every effort to complete adjudication as soon as the name check is completed.

27 | Rangaswamy Decl., p. 9 ¶ 21.

28 |     Many courts have refused to grant relief under the APA, even when naturalization or other

immigration applications were pending for significant time periods. <u>See</u> <u>Saleh</u>, 367 F. Supp. 2d at

513 (finding five-year delay not in violation of APA in part in light of volume of applications);

<u>Espin v. Gantner</u>, 381 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (over three-year delay not unreasonable

because of government's limited resources and substantial caseload); <u>Alkenani v. Barrows</u>, 356 F.

Supp. 2d 652, 656-57 (N.D. Tex. 2005) (no unreasonable delay found in naturalization context

because of need to wait for completion of FBI investigation). Just as in these cases, Plaintiff in the

present case insist that this Court find an unreasonable delay based solely on the amount of time

passed since receipt of his application. However, the law requires a more in-depth analysis for

mandamus relief under the APA. A review of the six <u>TRAC</u> factors shows that Defendants have not

unreasonably delayed actions pertaining to Plaintiff's naturalization application.

## VI.    CONCLUSION

For the foregoing reasons, Defendants respectfully ask the Court to dismiss Plaintiff's

Complaint for lack of subject-matter jurisdiction. In the alternative, Defendants respectfully ask the

Court to grant summary judgment in their favor.

Dated: April 21, 2008                                    Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney


_____/s/_____
MELANIE L. PROCTOR
Assistant U.S. Attorney
Attorneys for Defendants

DECLARATION OF JANAKI RANGASWAMY

I, JANAKI RANGASWAMY declare as follows:

1.    I am employed by the United States Citizenship and Immigration Services (hereinafter "USCIS") as Supervisory Center Adjudications Officer (SCAO), at the California Service Center (CSC) in Laguna Niguel, California. I have been employed as an SCAO since November 2005 and have been employed in other capacities by the agency since May 1992. I am currently the supervisor of the N-400 unit which is responsible for overseeing the intake processing of N-400 Applications for Naturalization from initial receipt of the application by the CSC through the receipt of FBI name check clearances and scheduling the naturalization examination or interview in the USCIS district or field office where the applicant resides.

2.    This declaration is submitted in support of Defendants' Motion to Dismiss in the case of Arreola v. Mukasey, 08 CV 00777, currently pending in the Northern District of California. This declaration provides a factual summary of the agency's adjudication policy as well as a review of the plaintiff's file. As Supervisor of the N-400 unit at CSC, I am in charge of the team that monitors and oversees the intake processing of the N-400 application for naturalization involved in this litigation. The information below is based upon review of the files, electronic records, personal knowledge, and other information that has become known to me in the course of my official responsibilities concerning the processing of this application.

3.    The CSC is responsible for the receipt, processing and adjudication of certain immigrant and nonimmigrant visa petitions and other applications filed by petitioners and applicants residing in the western United States as well certain forms and petitions transferred from other Service Centers. Until last summer the CSC was averaging 115,915 completions per month, including the receipt of and initial processing of N-400s prior to their transfer

to local district offices. During Fiscal Year 2007 the CSC oversaw the initial receipt of 401,050 N-400s for an average of 33,421 per month and completed the initial processing of 227,165 N-400s.

4.    There are four Service Centers throughout the United States, each of which has jurisdiction over certain types of applications and petitions either filed within their respective geographic areas or assigned to them as part of a national bi-specialization effort. The four Service Centers combined average 387,776 receipts per month, or 4,265,536 in the last eleven months. Some Service Centers are the sole adjudicators of certain types of petitions; for instance the Nebraska Service Center adjudicates all refugee adjustment applications and all NAFTA applications, whereas the Vermont Service Center adjudicates all battered spouse applications. The Service Centers fulfill part of the USCIS responsibility to adjudicate benefits applications and are allocated part of the USCIS adjudication resources. In order to maximize productivity, the Service Centers have no public interface and process and adjudicate only petitions and applications that do not require personal interviews. Additionally, Service Centers do initial receipt, file creation, security clearances and processing of some petitions and applications that do require personal interviews prior to their relocation to USCIS District Offices. This includes Form N-400, Application for Naturalization, and Form I-589, Application for Asylum and for Withholding of Removal. In Fiscal Year 2007 USCIS received nearly 1.4 million applications for naturalization, nearly double the volume received the previous fiscal year. For the months of June and July 2007 USCIS received a 350 percent increase in N-400 applications compared to the same period in 2006.

5.    When a visa petition or other application seeking an immigration benefit on behalf of an alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security background checks. These checks are conducted both to enhance national security and ensure the integrity of the immigration process. These security and background checks serve to screen out aliens who may seek to harm the United States

2

and its citizens or who may be seeking immigration benefits improperly or fraudulently. These security checks have yielded significant derogatory information about alien applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. This has resulted in the alien being found ineligible for the immigration benefit and USCIS's denial of the application or petition. Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported from the United States.

6.    The attached Fact Sheet explains the different types of checks that must be completed. (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached hereto as Exhibit 1). The checks include the FBI Name Check, FBI fingerprint check, and the DHS-managed Interagency Border Inspection System (IBIS). The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement agencies that contain information that is not necessarily revealed by the FBI's fingerprint check or IBIS. Although in the majority of FBI name checks no matches are found, some cases involve complex or highly sensitive information and cannot be resolved quickly. The IBIS system contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central system that combines information from these various sources and databases to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. IBIS provides, but is not limited to, information related to persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the results of an IBIS query are usually available immediately, in some cases information

found will require further investigation. Finally, FBI fingerprint checks provide information relating to criminal background within the United States. Results are usually received within days and while the vast majority result in no criminal record, positive results may have a direct bearing on the eligibility of an applicant for the immigration benefit being sought.

7.  The FBI has an established process of processing FBI Name Check requests from USCIS chronologically based on the date the request is forwarded. Since September 11, 2001, USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog in FBI's performance of complete security checks. During the initial submission period of December 2002 and January 2003, USCIS submitted almost 3 million names to the FBI. As of May 2007, USCIS had approximately 329,160 pending FBI Name Check requests with approximately 32 percent pending more than one year.

8.  Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past. In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible. However, the public safety requires USCIS to make certain that the checks have been done before it adjudicates any application or petition and before it issues any immigration status documents to such persons. Accordingly, pursuant to established agency policy, all required security checks must be completed prior to adjudication of the application.

9.  For most applicants, USCIS can quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration

4

benefits. However, due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the FBI or other relevant agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy. Moreover, in some cases a background or security check will reveal that positive (derogatory) information on the subject alien is possessed by some agency other than USCIS without necessarily revealing the substance of that information. In such cases, USCIS works closely with the other law enforcement or intelligence agencies to obtain all available information concerning the positive result in order to properly evaluate its significance. Even where the FBI or a third agency has provided a final response, a case may still be considered pending where the response requires further investigation or review by USCIS or another agency. It is vitally important to thoroughly screen each applicant in order to resolve all concerns of a law enforcement or national security nature before determining that an individual is eligible for an immigration benefit.

10.    USCIS will continue to perform any outstanding background and security checks as expeditiously as possible to ensure that no eligible alien must wait longer than is reasonably necessary to receive a decision on his or her application or petition and to receive evidence of his or her immigration status.

11.    Since only aliens who are lawful permanent residents may apply for naturalization, all applicants for naturalization already have a previously created permanent immigration file (A-file) which houses their application for permanent residence and related files. Once USCIS receives an N-400 Application for Naturalization, the application is keyed in, placed into a receipt folder, a T-file (temporary file) is created and the A-file is requested electronically through the Central Immigration System ("CIS"). The T-file is placed on an N-400 shelf until the A-file is received and the N-400 is then consolidated into the permanent A-file. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a FBI name

check request by the CLAIMS 4 (Computer Linked Access Information Management System) via FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. That electronic transmission of the FBI name check request by CLAIMS 4 is done automatically when the N-400 is first received and keyed in at the Service Center and before the N-400 is placed on the N-400 shelf to await completion of all necessary security checks, including the FBI name check, and request by the local USCIS district offices for transfer of N-400s ready for interview and adjudication. N-400s are separated on the N-400 shelf by local district offices in accordance with the geographic location of the applicant and generally in chronological order according to date of receipt.

12.    The FBI Name Check Quality Assurance desk of USCIS Service Center Operations issues a report to the CSC once or twice a month to identify N-400 applications that have received a "No Data" or "Error" response indicating a problem with transmission of the name check request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks. Additionally, the CSC N-400 unit runs C4 Workflow Current Activity Report monthly or more often as needed. In addition to other queries, this report identifies those cases queries those N-400 applications pending at the CSC which have an FBI name check response "ERROR". If more than 60 days have elapsed since the FBI response date, then these cases are entered into a spreadsheet and re-submitted to the FBI. The CSC also runs a RAFACS report approximately at least every other month that audits or "sweeps" all pending N-400s located at the CSC to determine the current status and to identify and resolve any problems. This report is reviewed to ensure that all necessary fingerprints and security checks, including the FBI name check, have been transmitted properly. FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending". An FBI Name

6

Check that has been completed will be indicated by various entries depending on the result, including No Record, Positive Record, etc.

13.    These reports do not provide USCIS with any information as to what information the FBI may have relating to a particular alien, whether an FBI investigation into the particular alien has been undertaken, or whether there are national security concerns relating to that alien. Once a response is received from the FBI, that information is automatically uploaded in CLAIMS 4. Once the FBI name check and other security checks are completed, CLAIMS 4 automatically moves the N-400 into an interview queue. The N-400s then remain in the interview queue to await scheduling of interviews by the district offices. District Offices request the transfer of N-400s from the CSC from the interview queue by a "pick list" in accordance with their available adjudication resources and workload. Once an N-400 is requested by a district office the file is pulled by a contractor and is transferred to the district office in time for interview and adjudication there.

14.    USCIS has a process for expediting processing of certain applications and petitions. It is important to note that whenever a particular application or petition receives expedited processing and is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date. If, for example, USCIS asks the FBI to expedite a name check in a particular case, this action comes at the expense of other name check cases because the FBI would have fewer resources with which to work other pending cases.

15.    In order to address in a consistent and fair manner the increasing number of mandamus actions filed nationwide by aliens awaiting decisions on their petitions and applications, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in the following situations:

    1.    Military Deployment.

    2. Age-out cases not covered by the Child Status Protection Act and applications affected by sunset provisions such as the Diversity Visa Program.

    3. Compelling reasons provided by the requesting office such as critical medical conditions.

    4. Loss of Social Security benefits or other subsistence at the discretion of the Director.

16. To my knowledge, Plaintiff has not made a formal request for expedited processing. Moreover, U.S. Citizenship and Immigration Services (USCIS) will not routinely request the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

17. USCIS reports the average processing times for specific applications and petitions on the USCIS website. This information reflects only average processing times on the date the information is published. Average processing times fluctuate widely and will sometimes even regress for a specific form time due to a number of factors, including a reallocation of agency resources, reordering of the agency's priorities, and other reasons. Additionally, not every application will require the same level of inquiry. Some may require a more detailed level of review and or investigation from either the USCIS or other agencies for a number of reasons ranging from the alien's eligibility for the benefit sought to national security concerns. Accordingly, even when it appears that the adjudication of a particular application is outside the average processing time, this does not establish that the delay is unreasonable or even due to factors within the control of the agency.

18. There is no statutory or regulatory time limit for the adjudication of N-400s. Moreover, during the continued pendency of a naturalization application, the alien retains all of the rights and benefits of a permanent resident of the United States, including the right to live and work in this country and to travel freely abroad. Thus, applicants for naturalization

are not as adversely affected by delays in the adjudication of their applications as are aliens filing for other immigration benefits.

19. In my capacity as Supervisory Center Adjudication Officer of the CSC, I have access to the official files and records of the USCIS. I have reviewed the system records for plaintiff Jorge Arreola, A70212570. Plaintiff Arreola is a native and citizen of Mexico. His status was adjusted to that of a Lawful Permanent Resident (LPR) of the United States on November 13, 2001. On September 5, 2006, he filed an N-400 Application for Naturalization with the California Service Center. On September 18, 2006 a name check request was sent to the FBI in connection with this N-400. The results of that name check request remain pending as of today's date.

20. In accordance with 8 CFR § 335.2(b), in the absence of a "definitive response" from the FBI with regard to the name check request, the plaintiff may not be scheduled for a naturalization interview and his case remains in a holding status.

21. Once the required security checks are completed, including the FBI name check, plaintiff's N-400 application will immediately be placed in the electronic queue to be scheduled for an interview in the District Office or the appropriate sub-office on the first available date in that location. The CSC will also immediately transfer the A-file to the place where the interview will take place. In the event that the FBI eventually reports a "positive response" or "PR," significant additional time would likely be required while USCIS learns the precise nature of the positive information and determines whether it would have any bearing on the outcome of the adjudication. Until such time as all security checks are complete, USCIS is unable to complete the processing and adjudication of this N-400 application.

I declare under penalty of perjury that the foregoing is true and correct. Executed this first day of April, 2008 at Laguna Niguel, California.


JANAKI RANGASWAMY
Supervisory Adjudication Officer
California Service Center

EXHIBIT 1

*Press Office*
**U.S. Department of Homeland Security**



April 25, 2006

# Fact Sheet

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—**  IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns.  USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States.  Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit.  Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement.  Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS.  Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

1    JOSEPH P. RUSSONIELLO (CSBN 44332)
     United States Attorney
2    JOANN M. SWANSON (CSBN 88143)
     Chief, Civil Division
3    MELANIE L. PROCTOR (CSBN 228971)
     Melanie.Proctor@usdoj.gov
4    Assistant United States Attorney

5        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
6        Telephone: (415) 436-6730
         FAX: (415) 436-7169
7
     Attorneys for Defendants
8
                    UNITED STATES DISTRICT COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN JOSE DIVISION
11
     JORGE ADAN ARREOLA,              )        No. C 08-777 JF
12                                    )
                    Plaintiff,        )
13                                    )
         v.                           )
14                                    )        PROPOSED ORDER
     MICHAEL B. MUKASEY, United States )
15   Attorney General; et al.,        )
                                      )
16                  Defendants.       )
                                      )
17
18        Plaintiff asks the Court to compel Defendants to adjudicate his application for naturalization.

19   Plaintiff's name check is not complete, and the U.S. Citizenship and Immigration Services

20   ("USCIS") has not yet interviewed him.  Defendants move the Court to dismiss this action for lack

21   of subject matter jurisdiction.  Defendants argue that the Court lacks jurisdiction to compel the

22   Federal Bureau of Investigation ("FBI") to complete Plaintiff's name check, and that because

23   Plaintiff's name check is not complete, there is no duty to adjudicate his application.  The Court

24   agrees with Defendants.

25        The FBI's name check process is discretionary.  Konchitsky v. Chertoff, No. C-07-00294

26   RMW, 2007 WL 2070325, at *6-7 (N.D. Cal. July 13, 2007).  In addition, the FBI's involvement

27   in the naturalization process arises only out of a contract between USCIS and the FBI.  Id.  Congress

28   has forbidden USCIS from spending money to "complete adjudication" of applications for

PROPOSED ORDER
C 08-777 JF

1  naturalization until a full criminal background check is completed.  Departments of Commerce,

2  Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, Pub. L. 105-119,

3  111 Stat. 2440, 2448-49.  Under USCIS's regulations, the examination may not take place until after

4  the background investigation has been completed.  8 C.F.R. § 335.2(b).  Accordingly, because

5  USCIS is forbidden by statute and regulation from taking action on Plaintiff's application, Plaintiff

6  cannot establish the existence of a nondiscretionary duty or that action has been unreasonably

7  delayed.

8       Having so determined, the Court need not address the question of whether action on

9  Plaintiff's application has been unreasonably delayed.  The Complaint is hereby DISMISSED, with

10 prejudice.  The Clerk shall close the file.

11      IT IS SO ORDERED.

12

13                                        _____
                                         JEREMY FOGEL
14                                        United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28